# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**United Steel, Paper and Forestry, Rubber,**   )
**Manufacturing, Energy, Allied Industrial**     )
**and Service Workers International Union,**      )
***et al.*,**                                     )
                                        )
          **Plaintiffs,**          )
                                        )
        **v.**                       )     **Civil No. 13-cv-01301 (APM)**
                                        )
**Federal Highway Administration, *et al.*,**    )
                                        )
        **Defendants.**           )
_____ )

## MEMORANDUM OPINION

## I.    INTRODUCTION

To support the domestic steel and iron industries, Congress for decades has required that steel or iron used in federally funded highway programs be sourced from within the United States, a mandate known as the "Buy America" policy.  Congress has empowered the Secretary of the U.S. Department of Transportation to administer the Buy America requirement, including granting him the authority to exempt products from the policy where in the public interest.  This case concerns the Secretary's exercise of that exemption authority.

On December 21, 2012, the Secretary, acting through Defendant Federal Highway Administration ("FHWA"), issued a two-page memorandum (the "2012 Memorandum") announcing that he would *not* apply the Buy America requirement to two broad categories of products:  (1) steel or iron "manufactured" products and (2) "miscellaneous steel or iron" products.  As to the first category, a steel or iron "manufactured" product is one that is made up largely, but not entirely, of steel or iron.  The 2012 Memorandum exempts from the Buy America mandate

steel or iron manufactured products that contain less than 90 percent steel or iron (the "90-Percent Threshold").  As a result, a manufactured product that contains no more than 89.9 percent steel or iron now can be obtained from a foreign source.  As to the second category of products, the 2012 Memorandum exempts all "miscellaneous steel and iron" products, defined as those products that are available "off-the-shelf" or are "necessary to encase, assemble and construct" manufactured products (the "Miscellaneous Products Exemption").  So, for instance, a faucet or bolt that is made of 100 percent steel or iron now is exempt from the Buy America requirement.

The plaintiffs in this case are (1) a workers' union whose members produce steel and iron products—United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union; (2) six individual manufacturers of steel and/or iron products—Nucor Corporation; D&L Foundry Inc.; EBAA Iron Sales Inc.; EJ USA Inc.; Neenah Foundry; McWane, Inc.; and (3) an association of steel and iron products manufacturers—the Municipal Castings Association.  They filed suit against the FHWA and the Secretary of the U.S. Department of Transportation, Anthony Foxx, in his official capacity, alleging that both the 90-Percent Threshold and the Miscellaneous Products Exemption violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*  Specifically, Plaintiffs assert (1) that both the 90-Percent Threshold and the Miscellaneous Products Exemption are "substantive" rules that should have been subject to notice and comment rulemaking under Section 553 of the APA; (2) that both the 90-Percent Threshold and the Miscellaneous Products Exemption are arbitrary and capricious, are not in accordance with law, and did not observe procedure required by law, in violation of Section 706 of the APA; and (3) that the FHWA failed to publish the regulatory flexibility analyses required by the Regulatory

Flexibility Act. On these grounds, Plaintiffs urge the court to declare unlawful and invalidate the 2012 Memorandum.

Before the court are Plaintiffs' and Defendants' Cross-Motions for Summary Judgment. After considering the parties' arguments and the administrative record, the court finds that both the 90-Percent Threshold and the Miscellaneous Products Exemption violate the APA. The 90-Percent Threshold is invalid because the Secretary failed to subject it to notice and comment rulemaking and because the 90 percent figure is itself arbitrary and capricious. The Miscellaneous Products Exemption likewise is invalid not only because it was not subjected to notice and comment under Section 553 of the APA, but also because it did not undergo a separate notice and comment process for Buy America waivers that is required by law. The court therefore grants Plaintiffs' Motion for Summary Judgment and denies Defendants' Motion for Summary Judgment. The court further vacates the 90-Percent Threshold and the Miscellaneous Products Exemption and remands these rules to the Department of Transportation and the FHWA for further proceedings consistent with this Memorandum Opinion.

## II.    BACKGROUND

### A.    The Surface Transportation Assistance Acts of 1978 and 1982 and Their Implementing Regulations

The court begins with the history of the "Buy America" requirement. Two pieces of legislation provide the starting point: (1) the Surface Transportation Assistance Act of 1978 (the "1978 Act"), Pub. L. No. 95-599, 92 Stat. 2689 (1978) [hereinafter 1978 Act], and (2) the Surface Transportation Act of 1982 (the "1982 Act"), Pub. L. No. 97-424, 96 Stat. 2097 (1983) [hereinafter 1982 Act], which amended the 1978 Act. Congress passed the 1978 Act, in part, "to authorize appropriations for the construction of certain highways." 1978 Act at Preamble. Section 401 of

3

the 1978 Act is the genesis for the Buy America policy at issue in this case.  It read, in relevant part:

> [T]he Secretary of Transportation shall not obligate any funds authorized to be appropriated by this Act or by any Act amended by this Act and administered by the Department of Transportation, whose total cost exceeds $500,000 unless only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, and supplies mined, produced, or manufactured, as the case may be, in the United States, will be used in such project.

*Id.* § 401(a).

The 1978 Act permitted the Secretary of Transportation to exempt from Buy America coverage products as to which the "application [of Buy America] would be inconsistent with the public interest." *Id.* § 401(b)(1).  The Secretary immediately invoked this public interest exemption, narrowing the coverage of Buy America only to "structural steel," *see* Buy America Requirements, 43 Fed. Reg. 53717, 53717 (Nov. 8, 1978), which the Secretary defined as "shapes, plates, H-piling, and sheet piling," 23 C.F.R. § 635.410(b)(2) (1978).  *See also* 43 Fed. Reg. at 53717 ("[T]he [Federal Highway] Administrator has determined that it would be in the public interest to temporarily waive the provisions of section 401 as it applies to products and materials, other than structural steel, used in highway construction.").

Four years later, Congress passed the 1982 Act, which superseded or amended certain provisions in the 1978 Act.  Section 165 of the 1982 Act expressly superseded Section 401 of the 1978 Act and provided that the "Secretary of Transportation shall not obligate any funds [for federal highway construction projects] unless steel, cement[1], and manufactured products used in such project are produced in the United States."  1982 Act § 165(a).  The FHWA's implementing

---

[1] In 1984, Congress amended Section 165 to remove "cement," thereby eliminating Buy America coverage for cement products.  *See* Pub. L. No. 98-229, § 10, 98 Stat. 55, 55 (1984) ("Section 165(a) of the [1982 Act] is amended by striking out ', cement,'.").

4

regulations, issued in 1983 after notice and comment rulemaking (the "1983 Regulations"),

significantly expanded the scope of Buy America coverage to include "all steel products," not just

"structural steel."  As the 1983 Regulation's comments explained:

> By denoting "steel" in Section 165 (1982 STAA), Congress called attention to their intent to make the coverage more encompassing.  The legislative history is also clear on this point.  Congressional concern that Federal money spent to improve highways should also aid U.S. industry is apparent in the first sentence of Section 165 which requires the Secretary of Transportation to ensure that funds authorized for Federal-aid highway projects would only buy U.S. made steel.  The FHWA therefore, has expanded the Buy America rule to include *all steel products*.

Buy America Requirements, 48 Fed. Reg. 53099-02, 53102 (Nov. 25, 1983) (emphasis added).

Various guidances issued by the FHWA since the 1983 Regulations have confirmed the

applicability of Buy America to all steel components and subcomponents, regardless of their form

and the extent to which they comprise a particular product.  *See* Appendix A.

Similar to the 1978 Act, the 1982 Act authorized the Secretary to exempt products from

the Buy America requirement where the policy's "application would be inconsistent with the

public interest."  1982 Act § 165(b)(1).  And, in the 1983 Regulations, the Secretary again invoked

this authority, "find[ing] that it is in the public interest to waive the application of Buy America to

manufactured products *other than steel . . . manufactured products*."  48 Fed. Reg. at 53102.

(emphasis added).  The FHWA's explanation for the "waiver" for non-steel manufactured products

focused on the difficulty of tracing the materials that comprise such products.  "The FHWA agrees

with the commenters who noted that it is very difficult to identify the various materials and then

trace their origin.  A manufactured product such as a traffic controller which has many components

is particularly difficult to trace."  *Id.*  Notably, the 1983 Regulations did not include a definition

of "manufactured products."

Additional legislative updates brought the Buy America requirement to its present form.

In 1991, Congress passed the Intermodal Surface Transportation Efficiency Act of 1991 (the

"ISTEA"), Pub. L. 102-240, 105 Stat. 1914 (Dec. 18, 1991).   The ISTEA extended the Buy

America preference to domestically produced iron, *id.* § 1048(a), and the "coating of steel," *id.*

§ 1041(a).   The ISTEA also included certain reporting requirements to Congress, *id.* § 1048(e),

and added penalty provisions for false certifications, *id.* § 1048(f).   And in 2005, the Buy America

law was codified in its present form at 23 U.S.C. § 313, which reads:

> Notwithstanding any other provision of law, the Secretary of Transportation shall
> not obligate any funds authorized to be appropriated to carry out the Surface
> Transportation Assistance Act of 1982 (96 Stat. 2097) or this title and administrated
> by the Department of Transportation, unless steel, iron, and manufactured products
> used in such project are produced in the United States.

23 U.S.C. § 313(a).

### B.        The 1997 Memorandum

On December 22, 1997, the FHWA, through the Chief of its Highway Operations Division,

issued a memorandum to FHWA's Chief Counsel, Edward V. A. Kussy[2], with the subject line

"Buy America Policy Response" (the "1997 Memorandum").   Administrative R., ECF No. 36-1

[hereinafter AR], at 12-13.   The 1997 Memorandum addressed the waiver of Buy America for

non-steel "manufactured products," as set forth in the 1983 Regulations.   First, the 1997

Memorandum defined a manufactured product as "any item that must undergo one or more

manufacturing processes before the item can be used in a highway project" and noted that such

products "may be usable as a stand-alone product, or as a component within a more complex

assembly which would also be considered a manufactured product."   *Id.* at 12.   It then attempted

to clarify how, in practice, the FHWA applies the manufactured products waiver.   "While FHWA

does not apply Buy America requirements to 'manufactured products,' [it] do[es] apply the

---

[2] In their briefs, Defendants state that the 1997 Memorandum was sent to FHWA's Division offices.  *See, e.g.*, Defs.' Mot. for Summ. J. & Opp'n to Pls.' Mot., ECF No. 28, at 6.   Though not apparent from the face of the Memorandum, that assertion is sensible given that FHWA's Division offices are responsible for enforcing the Buy America policy.

requirements to specific components within those products." *Id.* at 13.  To provide an example, the 1997 Memorandum applied this policy to a bridge bearing, a component that typically provides a resting surface between bridge piers and the bridge deck[3]:

> [I]f a bridge bearing was considered only as a manufactured product, it would be exempt from the Buy America requirements.  However, FHWA policy has been that the steel components of a *predominately steel product* must be of domestic manufacture unless the value of the components is less than the minimal use threshold[4] for the project.

*Id.* (emphasis added).  In other words, pursuant to the 1997 Memorandum, if a manufactured product "predominately" consisted of steel, and the narrow, minimal use exception was inapplicable, its steel components were required to be produced in the United States.  The 1997 Memorandum did not, however, define the word "predominately."

### C.    The 2012 Memorandum

From the foregoing backdrop emerged the document at the center of this dispute:  the 2012 Memorandum issued by the FHWA's Associate Administrator for Infrastructure, John Baxter, to the leaders of the FHWA's Division and Field offices.  Like the 1997 Memorandum, the 2012 Memorandum sought to "clarif[y] the [FHWA's] position regarding application of Buy America requirements to manufactured products."  AR at 53.

The 2012 Memorandum is hardly a model of draftsmanship.  It began by observing that in the 1983 Regulations "the FHWA found that it was in the public interest to waive application of Buy America to manufactured products other than steel and iron manufactured products."  *Id.*  It then noted that the 1997 Memorandum "clarified that, while Buy America does not apply to

---

[3] *See* https://en.wikipedia.org/wiki/Bridge_bearing (last visited Dec. 22, 2015).
[4] The 1983 Regulations also included a "minimal use" exception to Buy America.  The exception exempted "foreign . . . steel materials, if the cost of such materials used does not exceed one-tenth of one percent (0.1 percent) of the total contract cost or $2,500, whichever is greater."  23 C.F.R. § 635.410(b)(4).

manufactured products, Buy America does apply to components of 'predominately steel products.'" *Id.*

The 2012 Memorandum went on to explain that, as a result of various project reviews, questions had arisen "regarding the scope of the application of the 1983 public interest wavier for manufactured products." *Id.* "For example," the Memorandum stated, "it has been suggested that nuts, bolts, washers, and other miscellaneous steel and iron parts used in common off-the-shelf products such as toilets and the filaments in light bulbs must be Buy America compliant." *Id.* Concerned that such an interpretation is "inconsistent with the previous 1983 waiver decision and . . . not cost-effective to administer," the FHWA found it "necessary to clarify the applicability of the waiver for manufactured products." *Id.* The Memorandum then stated that the "FHWA continues to support the Buy America waiver for manufactured products in the 1983 [Regulations], as clarified by the 1997 [Memorandum]." *Id.* at 54. That waiver, it noted, "was intended to apply to all manufactured products except for steel and iron manufactured products." *Id.*

Thereafter, the logic of the 2012 Memorandum becomes increasingly difficult to follow. Although the preface of the Memorandum identified concerns about the application of Buy America to miscellaneous products, such as bolts and washers, the Memorandum then refers to a different type of product—a traffic controller, which the 1983 Regulations had cited as an example of a complex article whose component parts are difficult to trace. *Id.*; *see also* 48 Fed. Reg. at 53102. The 2012 Memorandum did not explain here, or at any other point, how complex articles like traffic controllers are related to miscellaneous products. It then observed that, since the issuance of the 1983 Regulations, some states had subjected "signal heads and other traffic control equipment to Buy America," leading them to seek "project specific waivers"—apparently an

unintended result.  AR at 54.  From this discussion of waivers for traffic control equipment, the

2012 Memorandum then, without explanation, pivoted back to miscellaneous products:

> In reexamining the extent of the 1983 waiver . . ., we believe that the scope of the waiver was intended to encompass miscellaneous steel or iron components and subcomponents that are commonly available as off-the-shelf products such as faucets, door hardware, and light bulbs.

*Id.*

In the very next paragraph the Memorandum's winding path continued, as it shifted to a

different product category—manufactured steel or iron products.  The Memorandum stated:

"Thus,"—as if a discussion about manufactured steel or iron products flowed logically from the

exemption of miscellaneous products—"in order for a manufactured product to be considered

subject to Buy America, the product must be manufactured predominately of steel or iron," *id.*—

the term "predominately" had appeared but was left undefined in the 1997 Memorandum.  The

Memorandum then announced:  "The FHWA deems a product to be manufactured predominately

of steel or iron if the product consists of at least 90% steel or iron content when it is delivered to

the job site for installation."  *Id.*  Accordingly, a manufactured product consisting of 90 to 100

percent steel or iron would be subject to Buy America requirements, whereas a product consisting

of 0 to 89.9 percent steel or iron would not.  The Memorandum noticeably did not explain how or

why the FHWA decided upon the 90-Percent Threshold.  Nor did it explain how the 90-Percent

Threshold logically connects to miscellaneous products.

The Memorandum then listed examples of "products that are subject to Buy America

coverage."  *Id.*[5]  And, thereafter, returned to the topic of miscellaneous products.  In its penultimate

---

[5] The examples were as follows:  "steel or iron products used in pavements, bridges, tunnels or other structures," such as "fabricated structural steel, reinforcing steel, piling, high strength bolts, anchor bolts, dowel bars, permanently incorporated sheet piling, bridge bearings, cable wire/stand, prestressing/post-tensioning wire, motor/machinery brakes and other equipment for movable structures"; "guardrail, guardrail posts, end sections, terminals, cable guardrail"; "steel fencing material, fence posts"; "steel or iron pipe, conduit, grates, manhole covers, risers"; "mast

paragraph, the Memorandum stated that "miscellaneous steel or iron components, subcomponents and hardware necessary to encase, assemble and construct the above components (or manufactured products that are not predominately steel or iron) are not subject to Buy America coverage." *Id.* It then provided examples of such items: "cabinets, covers, shelves, clamps, fittings, sleeves, washers, bolts, nuts, screws, tie wire, spacers, chairs, lifting hooks, faucets, door hinges, etc." *Id.*

In summary, and properly understood, the 2012 Memorandum exempted from the Buy America policy two categories of products: (1) manufactured products made up of less than 90 percent steel or iron; and (2) miscellaneous, or "off-the-shelf," steel or iron products. The court now turns to Plaintiffs' challenges to those exemptions.

## III.   DISCUSSION

### A.   Standard of Review

The parties have filed Cross-Motions for Summary Judgment. Such motions ordinarily are reviewed under the standard set forth in Federal Rule of Civil Procedure 56—summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases such as this one that involve the review of a final agency action under the APA, the Rule 56 standard does not apply. *See Stuttering Found. of Amer. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). Instead, "the district judge sits as an appellate tribunal" and "[t]he 'entire case' on review is a question of law." *Am. Biosci. Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citing cases). "[T]he court's review is limited to the administrative record," *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing *Camp v. Pitts*,

---

arms, poles, standards, trusses, or supporting structural members for signs, luminaries, or traffic control systems"; and "steel or iron components of precast concrete products, such as reinforcing steel, wire mesh and pre-stressing or post-tensioning stands or cables." *Id.*

411 U.S. 138, 142 (1973)), and its role is limited to "determin[ing] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did," *see Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citation and internal quotation marks omitted).

### B.    The 90-Percent Threshold

Plaintiffs argue that the FHWA's establishment of a 90-percent threshold to differentiate between steel or iron manufactured products that are subject to Buy America coverage and those that are not violated:   (1) Section 553 of the APA by creating a "substantive" rule without undertaking notice and comment rulemaking; and (2) Section 706 of the APA as agency action that is "arbitrary and capricious."[6]   Defendants dispute both contentions, asserting that the 90-Percent Threshold is an interpretive rule, derived from the word "predominately" in the 1997 Memorandum, and is neither arbitrary nor capricious.   The court agrees with Plaintiffs on both arguments.

#### 1.    *Notice and Comment Requirements of Section 553*

Section 553 of the APA imposes a procedural requirement on federal agencies when promulgating, amending, modifying, or repealing a rule.   5 U.S.C. § 553; *see also Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (stating that agencies must comply with Section 553 "prior to a rule's promulgation, amendment, modification, or repeal").   An agency seeking to take such action must publish "[g]eneral notice of proposed rule making . . . in the Federal Register" and "give interested persons an opportunity to participate in the rule making through

---

[6] Plaintiffs also have moved for summary judgment as to the 90-Percent Threshold on grounds that it is "not in accordance with law" and is "without procedure required by law" under Section 706 of the APA, and that it violates the Regulatory Flexibility Act.  *See* Pls.' Mot. 34-38. Defendants cross-moved on all of those grounds.  *See* Defs.' Mot. & Opp'n at 24-26, 28-29.   Because the court concludes that the 90-Percent Threshold is invalid for other reasons, it does not address those arguments.

submission of written data, views, or arguments with or without opportunity for oral presentation."

5 U.S.C. § 553(b)-(c).  The agency must then "consider[ ] . . . the relevant matter presented" before

issuing a final rule.  *Id.* § 553(c).  The Court of Appeals has stated that the notice and comment

requirement serves the dual purpose of:  (1) "reintroduc[ing] public participation and fairness to

affected parties after governmental authority has been delegated to unrepresentative agencies" and

(2) "assur[ing] that the agency will have before it the facts and information relevant to a particular

administrative problem, as well as suggestions for alternative solutions."  *Am. Hosp. Ass'n*, 834

F.2d at 1044 (citations and internal quotation marks omitted).

Congress included in Section 553 several exceptions to the notice and comment

requirement in order to, as stated by the Court of Appeals, "accommodate situations where the

policies promoted by public participation in rulemaking are outweighed by the countervailing

considerations of effectiveness, efficiency, expedition and reduction in expense."  *Guardian Fed.*

*Sav. & Loan Assoc. v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978).  The

exceptions relieve agencies of their notice and comment obligations when issuing "interpretative

rules, general statements of policy, or rules of agency organization, practice or procedure,"

"[e]xcept when notice or hearing is required by statute."  5 U.S.C. § 553(b)(A).  They also relieve

agencies of such obligations "when the agency for good cause finds . . . that notice and public

procedure thereon are impracticable, unnecessary, or contrary to the public interest."  *Id.*

§ 553(b)(B).  The exceptions, however, are to be "narrowly construed and only reluctantly

countenanced."  *N.J., Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980) (citations

omitted); *see also Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

2.     *The Interpretive Rule Exception*

The lone exception at issue in this case is that for interpretative rules—commonly referred to as interpretive rules.  Agencies need not subject interpretive rules to Section 553's notice and comment rulemaking requirements.  On the other hand, agencies *must* subject "substantive" rules to that procedural requirement.  Not surprisingly, the distinction between interpretive rules and substantive (or legislative rules) is "notoriously hazy."  *Orengo Caraballo v. Reich*, 11 F.3d 186, 194 (D.C. Cir. 1993) (citation and internal quotation marks omitted); *see also Air Transp. Ass'n of Am., Inc. v. FAA*, 291 F.3d 49, 55 (D.C. Cir. 2002) ("The distinction between a substantive rule and an interpretive rule can be less than clear-cut." (citations omitted)); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93 (D.C. Cir. 1997) (stating that the Court of Appeals has "long recognized that it is quite difficult to distinguish between" the two types of rules, and citing cases). "[D]eploying different verbal tests," courts in this Circuit "have generally sought to distinguish cases in which an agency is merely explicating Congress' desires from those cases in which the agency is adding substantive content of its own."  *Am. Hosp. Ass'n*, 834 F.2d at 1045.

In *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010), the Court of Appeals defined the line of demarcation this way:  "To fall within the category of interpretive, the rule must derive a proposition from an existing document whose meaning compels or logically justifies the proposition.  The substance of the derived proposition must flow fairly from the substance of the existing document."  *Id.* at 494 (citation and internal quotation marks omitted). Ultimately, determining "whether a given agency action is interpretive or [substantive] is an extraordinarily case-specific endeavor," *Am. Hosp. Ass'n*, 834 F.2d at 1045, that requires courts "not [to] defer to an agency's own characterization of a rule as interpretative, but rather [to] engage

in their own inquiry," *UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 69 (D.D.C. 2011) (citing *Sprint Corp. v. FCC*, 315 F.3d 369, 374-75 (D.C. Cir. 2003)).

3.       *Applicability of the Interpretive Rule Exception to the 90-Percent Threshold*

Plaintiffs assert that the 90-Percent Threshold is a substantive rule that FHWA failed to subject to notice and comment in violation of the APA.  The 90-Percent Threshold, they contend, sets forth "a new threshold for manufactured goods," Pls.' Mem. in Supp. of Mot. for Summ J., ECF No. 27 [hereinafter Pls.' Mot.], at 2, which cannot "remotely be said to flow from or be compelled by the language used to effectuate the [1983 Regulations' manufactured products] waiver," Pls.' Opp'n to Defs.' Cross-Mot. & Reply to Defs.' Opp'n, ECF No. 32 [hereinafter Pls.' Opp'n & Reply], at 13.  Defendants counter that the 90-Percent Threshold is an interpretive rule that clarified the meaning of the word "predominately," as used in the 1997 Memorandum.  *See* Defs.' Mot. for Summ. J. & Opp'n to Pls.' Mot., ECF No. 28 [hereinafter Defs.' Mot. & Opp'n], at 16; *see also* Mot. Hr'g Tr. 26:10-11, Oct. 16, 2015 (draft).  The 1997 Memorandum's use of "predominately" was itself an interpretive rule, Defendants argue, Defs.' Mot. & Opp'n at 19, which "explain[ed] the scope of the 1983 [R]egulation[s], under which FHWA already had the authority to enforce the national waiver for manufactured products," *id.* at 16.  *See also* Hr'g Tr. 27:7-9 ("[T]he 1997 [Memorandum] interpreted the 1983 waiver, and the 2012 [Memorandum] is [a] further interpretation of the word 'predominantly' and also the waiver[.]").  Thus, they contend, the 90-Percent Threshold is "fully consistent with the Buy America regulation and FHWA's previous interpretation"—it "does not impose a new law or obligation on the affected parties." Defs.' Mot. & Opp'n at 16.

In *Catholic Health Initiatives v. Sebelius*, the Court of Appeals examined provisions in a U.S. Department of Health and Human Service's manual that "rest[ed]," 617 F.3d at 494, on

statutory language "giv[ing] the Secretary authority to promulgate regulations defining 'the method or methods to be used, and the items to be included, in determining' what constitutes a [Medicare] provider's 'reasonable costs,'" *id.* at 496 (quoting 42 U.S.C. § 1395x(v)(1)(A)). Among the provisions set forth in the manual was a rule that limited, for certain providers, investment in equity securities listed on a U.S. stock exchange to "10 percent of the company's admitted assets, with the investment in any specific equity issue further limited to 10 percent of the total equity security investment." *Id.* at 492. The Court found the "10-percent rule" to be substantive, holding that "there is no way an interpretation of [the phrase] 'reasonable costs' can produce the sort of detailed—and rigid—investment code set forth in [the manual]." *Id.* at 496. In so ruling, the Court recognized the "general principle" that "when an agency wants to state a principle 'in numerical terms,' terms that cannot be derived from a particular record, the agency is legislating and should act through rulemaking." *Id.* at 495 (citing Henry J. Friendly, *Benchmarks* 144-45 (1967)).

In addition to citing Judge Friendly's writings, the Court of Appeals relied on *Hoctor v. USDA*, 82 F.3d 165 (7th Cir. 1996). *See id.* at 495-96. In *Hoctor*, the Seventh Circuit held that an agency creates substantive rules when issuing "reasonable but arbitrary (not in the 'arbitrary or capricious' sense) rules that are consistent with the statute or regulation under which the rules are promulgated but not derived from it, because they represent an arbitrary choice among methods of implementation." *Id.* at 170. "A rule that turns on a number," the court wrote, "is likely to be arbitrary in this sense." *Id.* Such rules are arbitrary in that they "could well be different without significant impairment of any regulatory purpose." *Id.* at 171. The court continued, stating that "[w]hen agencies base rules on arbitrary choices they are legislating . . . so the[ ] rules . . . require notice and comment rulemaking, a procedure that is analogous to the procedure employed by legislatures in making statutes." *Id.* at 170-71. On that basis, the court in *Hoctor* found that a rule

mandating that dangerous animals be housed within a fence "at least eight feet high" was substantive, where the regulation it purported to interpret required that housing for certain animals be of "appropriate" strength and "structurally sound." *Id.* at 168, 172.

Like the numerical thresholds at issue in *Catholic Health Initiatives* and *Hoctor*, the 90-Percent Threshold is a substantive rule for which the FHWA was required to seek notice and comment under the APA. The court so concludes for two main reasons. First, the 90-Percent Threshold cannot reasonably be understood, as Defendants contend, to interpret the word "predominately" as used in the 1997 Memorandum. That rigid percentage threshold is not "a proposition [derived] from an existing document whose meaning compels or logically justifies the proposition." *Catholic Health Initiatives*, 617 F.3d at 494 (citation and internal quotation marks omitted). Nor can the threshold be said to "flow fairly from the substance of an existing document." *Id.* Defendants' own arguments lay bare the lack of any rational connection between the 90-Percent Threshold and the word "predominately." In their briefing, Defendants offered the conclusory contention that 90 percent "is a reasonable figure between the extreme positions of 100% and 50%." Defs.' Reply to Pls.' Opp'n, ECF No. 35 [hereinafter Defs.' Reply], at 7. And, at oral argument, Defendants' counsel weakly asserted that "anyone would say [90 percent] is predominantly. Predominant means more than 50 percent." Hr'g Tr. at 30:8-9. Predominately surely means more than 50 percent. But how much more—40 percentage points, according to the 2012 Memorandum—cannot reasonably be derived from the 1997 Memorandum.

Second, as the court observed in *Catholic Health Initiatives*, numerical-based rules are susceptible to arbitrary selection and, when an agency arbitrarily selects a number, the agency engages in a legislative function. *See* 617 F.3d at 495. That is apparently what happened here. The 2012 Memorandum says nary a word about why 90 percent was chosen as the threshold value

to mean "predominantly." Not a single word. And Defendants' post-hoc efforts to rationalize the choice of that number ring hollow. For instance, in their briefs, Defendants contend that 90 percent was selected because a "100% criterion would allow for easy 'gaming' of the system by allowing a foreign manufacturer to . . . have a product that is 99.9% foreign steel or iron content but not . . . subject to the Buy America requirements" and that a "50% criterion would have a simple majority steel or iron content but not be 'predominantly'" steel or iron. Defs.' Reply at 7. Defendants added at oral argument that the FHWA selected 90 percent "using its best judgment based on almost 40 years of experience and technical expertise in this area." Hr'g Tr. 29:13-15. But even if those statements were accepted as true, nothing in the administrative record indicates why 90 percent is a superior threshold to 80 percent or 70 percent or 60 percent. Is a 90 percent threshold more difficult to "game" than a lower threshold? Would a lower threshold exclude too many products from Buy America coverage and thus harm the American steel industry? These and other questions are left unanswered. They were not even broached. Absent any record support, "'it is impossible to give a reasoned distinction between numbers just a hair on the OK side of the line and ones just a hair on the not-OK side.'" *Catholic Health Initiative*, 617 F.3d at 496 (quoting *Mo. Pub. Serv. Comm'n v. FERC*, 215 F.3d 1, 4 (D.C. Cir. 2000)). And, as in *Catholic Health Initiatives*, Defendants here have "not even made the attempt" to do so. *Id.*

None of the foregoing is meant to imply that every administrative rule that uses a numeric value is substantive. Indeed, in both *Catholic Health Initiatives* and *Hoctor*, the courts clearly stated that they "did not mean that 'an interpretive rule can never have a numerical component.'" *Id.* at 495 (quoting *Hoctor*, 82 F.3d at 171). "'Especially in scientific and other technical areas, where quantitative criteria are common, a rule that translates a general norm into a number may be justifiable as interpretation.'" *Id.*; *see also, e.g.*, *Am. Mining Cong. v. Mine Safety & Health*

*Admin.*, 995 F.2d 1106, 1112-13 (D.C. Cir. 1993) (holding that a rule establishing a numerical threshold to indicate the severity of a medical condition was interpretive); *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176-77 (D.C. Cir. 2007) (indicating but not deciding that a rule establishing a three-hour threshold to determine whether a particular medical treatment is "atypically intense" was interpretive).  But the 90-Percent Threshold does not arise in a scientific or technical area; rather, it is a numerical measure used in a commercial context to define which types of steel products are covered by Buy America and which are not.  FHWA offered no explanation for why that percentage threshold is reasonable, let alone superior to any other.  Contrary to Defendants' contentions, therefore, the court finds that the purported connection between the term "predominately" used in the 1997 Memorandum and the 90-Percent Threshold is "simply too attenuated to represent an interpretation" of the earlier release.  *Catholic Health Initiatives*, 617 F.3d at 496.

### 4. Arbitrary and Capricious Under Section 706

For largely the same reasons already discussed, the court also finds that the 90-Percent Threshold is arbitrary and capricious under Section 706 of the APA.  Under that section, a reviewing court may "hold unlawful and set aside an agency action" it deems to be "arbitrary [or] capricious."  5 U.S.C. § 706(2)(A).  When analyzing agency action under the "arbitrary and capricious standard," courts must determine whether the action at issue was based on "reasoned analysis."  *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56-57 (1983); *see also Republican Nat'l Comm. v. Fed. Election Comm'n*, 76 F.3d 400, 407 (D.C. Cir. 1996).  Generally, an agency has engaged in such analysis when the administrative record indicates it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Where, however, the administrative record indicates that an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," it has acted in an arbitrary and capricious manner. *Id.* Although this standard is not "particularly demanding," *Pub. Citizen, Inc. v. FAA.*, 988 F.2d 186, 197 (D.C. Cir. 1993), and a reviewing court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted), a court is not to "supply a reasoned basis for the agency's action that the agency itself has not given," *State Farm*, 463 U.S. at 43 (citation and internal quotation marks omitted).

Here, the FHWA's path to the 90-Percent Threshold cannot "reasonably be discerned." Indeed, there is no path to follow. Defendants have pointed to nothing in the administrative record that would support the conclusion that the FHWA's adoption of the 90-Percent Threshold was the product of "reasoned analysis." The court reaches this conclusion for much the same reason it found the 90-Percent Threshold to be a substantive rule—nothing in the 2012 Memorandum itself, the Administrative Record, or any other materials presented by the parties explains how or why Defendants selected 90 percent. The number quite literally appears to have been pulled out of thin air. Given the complete lack of explanatory support, Plaintiffs and this court are left to guess Defendants' rationale.

In that regard, the rule here is similar to a rule invalidated as arbitrary and capricious by the Court of Appeals in *American Trucking Associations, Inc. v. Federal Motor Carrier Safety Administration*, 724 F.3d 243 (D.C. Cir. 2013), *cert. denied sub nom. Trescott v. Federal Motor Carrier Safety Administration*, 134 S. Ct. 914 (2014). The rule in that case "bar[red] [short-haul] truckers from driving past 8 hours unless they have had an off-duty break of at least 30 minutes." *Id.* at 246. The Court of Appeals vacated the rule because the administrative record "contain[ed] not one word justifying the agency's decision to apply the new requirement to the unique context of short-haul operations." *Id.* at 253. The court also found that a "conclusory, post-hoc rationalization [offered by the agency fell] far short of what is required under [the Supreme Court's decision in] *State Farm.*" *Id.*

Similarly, in this case, the administrative record offers no explanation for the selection of the 90-Percent Threshold. Likewise, Defendants' "conclusory, post-hoc" statements that 90 percent "is a reasonable figure between the extreme positions of 100% and 50%," Defs.' Reply at 7, and that "[p]redominant means more than 50 percent," Hr'g Tr. at 30:9, demonstrate the threshold's arbitrariness, rather than a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (citation and internal quotation marks omitted). Thus, in addition to violating Section 553 of the APA, the 90-Percent Threshold violates Section 706 as arbitrary and capricious. On either of these grounds, the 90-Percent Threshold is invalid under the APA.

### C.     The Miscellaneous Products Exemption

The court turns now to Plaintiffs' challenge to the Miscellaneous Products Exemption. Once again, the 2012 Memorandum exempted from Buy America coverage "miscellaneous steel or iron components and subcomponents that are commonly available as off-the-shelf products such

as faucets, door hardware, and light bulbs." AR at 54. It also exempted "miscellaneous steel and iron components, subcomponents and hardware necessary to encase, assemble and construct [manufactured products]," such as "cabinets, covers, shelves, clamps, fittings, sleeves, washers, bolts, nuts, screws, tie wire, spacers, chairs, lifting hooks, faucets, door hinges, etc." *Id*.

Plaintiffs contend that that Miscellaneous Products Exemption violates: (1) Section 553 of the APA because it created a "substantive" rule that did not undergo notice and comment rulemaking; and (2) Section 706 of the APA because it is agency action "not in accordance with" and "without observance of procedure required by law."[7]

1. *Applicability of the Interpretive Rule Exception to the Miscellaneous Products Exemption*

Plaintiffs assert that the 2012 Memorandum created "a new . . . national waiver" for products previously covered under the Buy America policy. Pls.' Opp'n & Reply at 3; *see also* Pls.' Mot. at 2. "[F]or the first time," Plaintiffs say, "the FHWA has created a blanket waiver for all items that can be characterized as 'miscellaneous' components, subcomponents, or hardware that are permanently incorporated into a highway project, even [if] they are themselves *entirely manufactured of iron and steel*." Pls.' Mot. at 19 (emphasis added); *see also* Pls.' Opp'n & Reply at 2. This new waiver, Plaintiffs argue, is "a substantive rule issued without notice or comment." Pls.' Mot. at 30.

Defendants respond that the "2012 Memorandum . . . interprets the [1983 Regulations'] national waiver [for manufactured products] to include 'miscellaneous' steel and iron products that are 'commonly available off-the-shelf.'" Defs.' Mot. & Opp'n at 16. Specifically, Defendants

---

[7] Plaintiffs also have moved for summary judgment as to the Miscellaneous Products Exemption on grounds that it is "arbitrary and capricious" under Section 706 of the APA and violates the Regulatory Flexibility Act. *See* Pls.' Mot. 34-36, 40-42. However, as with the 90-Percent Threshold, the court does not address these arguments because it declares the Miscellaneous Products Exemption invalid on other grounds.

assert that the Miscellaneous Products Exemption is derived from the following comments to the

1983 Regulations:

> The FHWA agrees with the commenters who noted that it is very difficult to
> identify the various materials and then trace their origin.  A manufactured
> product such as a traffic controller which has many components is particularly
> difficult to trace.  For these reasons . . ., the FHWA finds that it is in the
> public interest to waive the application of Buy America to manufactured
> products other than steel and cement manufactured products.

48 Fed. Reg. at 53102.  Defendants contend that miscellaneous "items – like the 'traffic controllers'

specifically identified in the regulation – are covered under the general waiver because their origins

are difficult to trace."  Defs.' Mot. & Opp'n at 16.  Asked at oral argument if they claim that the

FHWA "deriv[ed] miscellaneous items as an exemption from . . . a traffic controller," Defendants

responded affirmatively.  Hr'g Tr. 38:7-10.

The court rejects Defendants' contention that the Miscellaneous Products Exemption is an

interpretive rule.  As previously discussed, interpretive rules "derive a proposition from an existing

document whose meaning compels or logically justifies the proposition" and "flow fairly from the

substance of the existing document."  *Catholic Health Initiatives*, 617 F.3d at 494 (citation and

internal quotation marks omitted).  They do not "constructively rewrite . . . regulation[s]" nor do

they "effect . . . totally different result[s]."  *Nat'l Family Planning & Reproductive Health Assoc.*

*v. Sullivan*, 979 F.2d 227, 236 (D.C. Cir. 1992).

The 1983 Regulations carried forward the broad exclusion for non-steel manufactured

products from Buy America coverage.  Such items were exempted from Buy America, the

comments explained, because "it is very difficult to identify [their] components and then trace

their origin."  48 Fed. Reg. at 53102.  The comments offered as an example "a traffic controller

which has many components" and "is difficult to trace."  *Id.*  In sharp contrast to the broad

*exclusion* for manufactured products, the 1983 Regulations emphasized the broad *inclusion* of "all

steel products." *Id.*  As the comments made clear, Congress drafted the 1982 Act with specific intent to supersede the Secretary's prior application of Buy America to "structural steel" only. *Id.* "By denoting 'steel' in Section 165 [of the 1982 Act]," the comments stated, "Congress called attention to their intent to make [Buy America] coverage more encompassing. . . .  The FHWA therefore, has expanded the Buy America rule to include all steel products." *Id.*

The Miscellaneous Products Exemption cannot reasonably be read, as Defendants contend, to derive from the 1983 Regulations.  The 1983 Regulations' exemption for non-steel manufactured products was based on the fact that such products were made of "various materials" and were "difficult to trace."  The 2012 Memorandum does not, however, tie the Miscellaneous Products Exemption to either of those rationales.  Instead, it tersely justified the exemption on the ground that including such products within Buy America's coverage would be "inconsistent with the previous 1983 waiver decision and . . . not cost-effective to administer."  AR at 53.  Thus, the Miscellaneous Products Exemption cannot be said to "flow fairly from" the 1983 Regulations.

Furthermore, the blanket exclusion for miscellaneous products is squarely at odds with the 1983 Regulations' requirement that "if . . . steel materials are to be used, all manufacturing processes for these materials must occur in the United States."  23 C.F.R. § 635.410(b)(1)(ii) (1983).  The only exception to this broad requirement was for steel products that fell below a "minimal use" threshold.  *Id.* at § 635.410(b)(4).  Otherwise, as the comments emphasized, the 1983 Regulations "expanded the Buy America rule to include *all steel products*."  48 Fed. Reg. at 53102 (emphasis added).[8]  The Miscellaneous Products Exemption thus had the effect of rolling back the blanket "all steel products" coverage set forth under the 1983 Regulations.  Products that are made of 100 percent steel and do not meet the minimal use exception, but otherwise meet the

---

[8] Guidances issued by the FHWA since the publications of the 1983 Regulations amplify that products made of 100 percent steel or iron are subject to Buy America.  *See* Appendix A.

loose definition of an "off the shelf" product, are no longer subject to Buy America. Such a result directly contradicts, instead of interprets, the broad protection afforded to steel products under the 1983 Regulations. "As the United States Supreme Court has noted, APA rulemaking is required if an interpretation 'adopt[s] a new position inconsistent with . . . existing regulations.'" *Air Transp. Ass'n*, 291 F.3d at 56 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)). That is precisely what has occurred here. For that reason, the court finds that the Miscellaneous Products Exemption established by the 2012 Memorandum is a substantive rule, which should have been subject to notice and comment rulemaking under Section 553 of the APA.

    2.    *Not in Accordance With and Without Observance of Procedure Required By Law Under Section 706*

The FHWA's failure to subject the Miscellaneous Products Exemption to notice and comment rulemaking also violated Section 706 of the APA. Under that section, a reviewing court may set aside agency action it finds was "not in accordance with law" or was taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C). Here, Plaintiffs assert that "all [Buy America] waivers . . . must be noticed in the Federal Register for comment and accompanied by findings related to one or more of the listed exemptions." Pls.' Mot. at 36. And, remarkably, Defendants do not disagree. They concur with Plaintiffs that "since June 6, 2008, any time the Secretary makes a new finding under 23 U.S.C. § 313(b) to waive Buy America requirements with respect to a project or projects, such findings and the justification therefore must be published in the Federal Register for notice and comment." Joint Status Report (Oct. 20, 2015), ECF No. 40 [hereinafter JSR], ¶ 7; *see also* Hr'g Tr. 37:15-16 (Defendants stating that "the law does require notice for all new waivers").

The requirement that new waivers undergo notice and comment rulemaking is set forth in the SAFETEA-LU Technical Corrections Act of 2008, Pub. L. 110-244, 122 Stat. 1572 (June 6, 2008) (the "TCA of 2008"), which provides:

> If the Secretary of Transportation makes a finding [that Buy America coverage should be waived] with respect to a project, the Secretary shall—publish in the Federal Register, before the date on which such finding takes effect, a detailed written justification as to the reasons that such finding is needed; and provide notice of such findings and an opportunity for public comment on such finding for a period of not to exceed 60 days.

*Id.* § 117(a)(1); *see also* JSR ¶ 3.   The Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. 112-55, 125 Stat. 552, (Nov. 18, 2011) (the "CFCAA of 2011"), which was in effect at the time the 2012 Memorandum was issued, also includes a notice and comment requirement, though one that is less demanding:

> Not less than 15 days prior to waiving, under his statutory authority, any Buy America requirement for Federal-aid highway projects, the Secretary of Transportation shall make an informal public notice and comment opportunity on the intent to issue such waiver and the reasons therefor[.]

*Id.* § 122; *see also* JSR ¶ 4.

Defendants argue that the Miscellaneous Products Exemption was in accord with the foregoing notice and comment requirements, and therefore did not violate Section 706 of the APA, because "the 2012 Memorandum *interpreted* the existing manufactured products waiver, and thus did not require notice and comment."   JSR ¶ 7 (emphasis added).   In other words, Defendants argue that the Miscellaneous Products Exemption was not a *new* waiver, but an interpretation of an old one.   The court already has rejected that argument.   *See supra* Part III.C.1.   The Miscellaneous Products Exemption was plainly a new wavier.   Whereas the 1983 regulations "expanded the Buy America rule to include *all steel products*," 48 Fed. Reg. at 53102, the 2012 Memorandum expressly exempted a group of miscellaneous steel products—described in the Memorandum as "off-the-shelf" steel products—from the Buy America policy.   Simply stated,

such products were subject to Buy America before December 21, 2012; but they were not after that date.  Such a wholesale re-categorization of a group of products is unquestionably a new waiver that was required to be subject to notice and comment under the TCA of 2008 and the CFCAA of 2011.  Defendants' failure to comply with those Acts means that the issuance of the Miscellaneous Products Exemption was "not in accordance with law" and "without observance of procedure required by law," in violation of Section 706 of the APA.

*                    *                    *

The court's holding here concerning the Miscellaneous Products Exemption should not be construed as a criticism of the substance of the Exemption or the FHWA's purpose in adopting it.  Indeed, the Exemption seems quite sensible.  But even when an agency adopts a sensible rule it must follow proper procedures.  Defendants failed to do so here.

## IV.   CONCLUSION

For the foregoing reasons, the court grants Plaintiffs' Motion for Summary Judgment and denies Defendants' Motion for Summary Judgment.  The court further vacates the 90-Percent Threshold and the Miscellaneous Products Exemption as set forth in the 2012 Memorandum, and remands these rules to the Department of Transportation and the FHWA for further proceedings consistent with this Memorandum Opinion.  A separate Order accompanies this Memorandum Opinion.

Dated:  December 22, 2015

Amit P. Mehta
United States District Judge